FRANK SIMS & STOLPER LLP
Andrew D. Stolper (Bar No. 205462)
astolper@lawfss.com
Jason M. Frank (Bar No. 190957)
jfrank@lawfss.com
Scott H. Sims (Bar No. 234148)
ssims@lawfss.com
19800 MacArthur Blvd., Suite 855
Irvine, California 92612
Telephone:   (949) 201-2400
Facsimile:    (949) 201-2405

FRANKLIN D. AZAR & ASSOCIATES
Jonathan Parrott (Bar No. 248652)
parrottj@fdazar.com
14426 East Evans Avenue
Aurora, CO 80014
Telephone:   (303) 757-3300
Facsimile:    (303) 759-5203

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FELIPE YBARRA and CESARIO SERRATO, Individually and as representatives of a class consisting of the participants and beneficiaries of the Supplemental Income 401(K) Plan,<br><br>Plaintiffs,<br><br>vs.<br><br>BOARD OF TRUSTEES OF SUPPLEMENTAL INCOME TRUST FUND; RICHARD BARBOUR; ROME A. ALOISE; KEITH FLEMING; CARLOS BORBA; and CLARK RITCHEY,<br><br>Defendants. | Case No.  8:17-cv-2091<br><br>**COMPLAINT FOR DAMAGES FOR BREACH OF ERISA FIDUCIARY DUTIES**<br><br>**[CLASS ACTION]**<br><br>**JURY DEMAND** |

Plaintiffs Felipe Ybarra and Cesario Serrato ("Plaintiffs"), individually and as representatives of participants and beneficiaries of the Supplemental Income 401(k) Plan (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§1001 et seq..  Plaintiffs bring this action on behalf of themselves, the Plan and the Plan's beneficiaries and participants (collectively the "Class") against the Plan sponsor, the Board of Trustees of Supplemental Income Trust Fund, and its past and present members, Richard Barbour, Rome A. Aloise, Keith Fleming, Carlos Borba, Clark Ritchey (collectively "Defendants") for breaching their fiduciary duties in the management, operation and administration of the Plan.

## INTRODUCTION

1.    The Supplemental Income 401(k) Plan[1] is a multi-employer defined contribution retirement plan for union members established under 29 U.S.C. §1002(34) of ERISA that enables eligible participants to make tax-deferred contributions from their salaries to the Plan.

2.    As of December 31, 2016, the Plan had 27,178 participants and $921,556,147 in assets, putting it in the top 1% of defined contribution plans in the United States.[2]

3.    The Board of Trustees of Supplemental Income Trust Fund is the sponsor and administrator of the Plan as defined under 29 U.S.C §§ 1002(16)(B) and 1002(16)(A)(i). The Board of Trustees and its individual members are Plan fiduciaries under 29 U.S.C. §1002(21)(A)(i) and (iii) because the Board of Trustees and its individual members have responsibility and discretionary authority to control the operation, management and administration of the Plan.

---

[1] 401(k) plans are named for 26 U.S.C. § 401(k), the Internal Revenue Code section that governs them.

[2] http://www.plansponsor.com/2016-Recordkeeping-Survey/

4.     ERISA imposes strict fiduciary duties of prudence and loyalty on covered retirement plan fiduciaries. An ERISA fiduciary must discharge his responsibility "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. § 1104(a)(1). A plan fiduciary must act "solely in the interest of [plan] participants and beneficiaries." *Id*. A fiduciary's duties include "defraying reasonable expenses of administering the plan," 29 U.S.C. § 1104(a)(1)(A)(ii), and a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

5.     The Board of Trustees and its individual members breached their fiduciary duties of prudence and loyalty to the Class by:

     a.  Offering retail class mutual fund shares when identical lower cost institutional class shares were available.  This resulted in the Class paying additional unnecessary expenses with no value to the Class; and

     b.  Overpaying for record keeping by paying the Plan record keeper, John Hancock Retirement Plan Services ("John Hancock") and its predecessor, New York Life Insurance Company, excessive fees through revenue sharing arrangements with the mutual funds offered as investment options under the Plan.

6.     Plaintiffs, individually and as the representatives of the Class, bring this action under 29 U.S.C. §§ 1132(a)(2) and (3) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Class all losses resulting from Defendants' breaches of fiduciary duties, and to restore to the Class any lost profits. In addition, Plaintiffs seek to reform the Plan to comply with ERISA and to prevent further breaches of fiduciary duties and grant other equitable and remedial relief as the Court may deem appropriate.

**JURISDICTION AND VENUE**

7.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because this is an action under 29 U.S.C. §§ 1132(a)(2) and (3).

8.     The Central District of California is a proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district where one of the plaintiffs resides, where at least one of the alleged breaches took place and where at least one of the Defendants resides.  The Southern Division of this District is a proper venue because at least 50% of the Defendants residing in the Central District reside in the Southern Division of the Central District.

**PARTIES**

**Plaintiffs**

9.     Plaintiff Felipe Ybarra is a citizen of the State of California who resides in Bloomington, California in the Central District of California. Ybarra is employed by San Bernardino Steel, a division of Herrick Corporation located in the Central District of California at 5454 Industrial Pkwy., San Bernardino, California, 92407. Ybarra is a participant in the Plan under 29 U.S.C. § 1002(7) and has been since 2011.

10.     Plaintiff Cesario Serrato is a citizen of the State of Colorado who resides in Aurora, Colorado. Serrato enrolled in the Plan in 2000 while employed by San Bernardino Steel, a division of Herrick Corporation located in the Central District of California at 5454 Industrial Pkwy., San Bernardino, California 92407. Serrato is a participant in the Plan under 29 U.S.C. § 1002(7) because he and his beneficiaries are eligible to receive benefits under the Plan.

11.     Ybarra and Serrato have standing under 29 U.S.C. §1132(a)(2) to bring this action on behalf of the Class because Defendants' actions caused actual harm to Ybarra and Serrato, and Defendants are liable the Class under 29 U.S.C. § 1109(a), at a minimum.

**The Plan**

12.    The Supplemental Income 401(k) Plan is established and maintained by a written plan document as required by 29 U.S. C. §1102(a)(1).

13.    The Plan is a multiple employer "employee pension benefit plan" under 29 U.S.C. §1002(2)(A), and an "individual account plan" or "defined contribution plan" under 29 U.S.C. §1002(34).

14.    To be eligible for participation under the Plan, an employee must be covered under a written collective bargaining agreement between his/her employer and a union that has been accepted for participation by the Supplemental Income Trust Fund. Employees who are eligible to participate in the Plan contribute to their individual accounts through payroll deductions.

15.    According to the Form 5500 filed by the Plan with the Department of Labor, as of December 31, 2016, the Plan had 27,178 participants and $921,556,147 in assets.

**Defendants**

16.    The Board of Trustees, 420 Virginia Street, Suite 2-B, Vallejo, California 94590, is the Plan Sponsor as defined under 29 U.S.C § 1002(16)(B).

17.    Defendant Richard Barbour is Executive Vice President of The Herrick Corporation and a current member of the Board of Trustees.  On information and belief, Mr. Barbour is a citizen of the State of California, working in Pleasanton, California and residing in that general area.

18.    Defendant Keith Fleming is the Chairman of the Board of Directors of Industrial Employers Distributors Association and a current member of the Board of Trustees.  On information and belief, Mr. Fleming is a citizen of the State of California, working in Emeryville, California and residing in that general area.

19.    Defendant Rome Aloise is Secretary-Treasurer of Teamsters Local 853 and a current member of the Board of Trustees.  On information and belief, Mr. Aloise is a citizen the State of California, working in Oakland, California, and residing in that general area.

20. Defendant Carlos Borba is the President of Teamsters Local 315 and a current member of the Board of Trustees. On information and belief, Mr. Borba is a citizen of the State of California, working in Vallejo, California and residing in that general area.

21. Defendant Clark Ritchey is Secretary-Treasurer of Teamsters District Council 2 and a current member of the Board of Trustees. On information and belief, Mr. Ritchey is a citizen of the State of California, working in Fullerton, California (in the Southern Division of the Central District) and residing in the Southern Division of the Central District of California.

22. The Board of Trustees and the individual trustees are fiduciaries to the Class under 29 U.S.C. §1002(21)(A)(i) and (iii), at a minimum, because they have sole authority to amend or terminate, in whole or part, the Plan or the Supplemental Income Trust, and have discretionary authority to control the operation, management and administration of the Plan, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

## FACTUAL ALLEGATIONS

### Defined Contribution 401(k) Plans

23. In a defined contribution plan, participants' retirement benefits are limited to the value of their own individual accounts, which is determined solely by employee and employer contributions plus the amount gained through investment in the options made available in the plan less expenses. *See* 29 U.S.C. §1002(34). Typically, plan participants direct the investment of their accounts, choosing from the lineup of plan investment options chosen by the plan sponsor.

24. Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers, poor investment performance and excessive fees can dramatically reduce the amount of benefits available when the participant is ready to retire. Over time, even small differences in

fees and performance compound and can result in vast differences in the amount of savings available at retirement. As the Supreme Court explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. at 1825.

25.    The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).[3]

26.    The marketplace for retirement plan services is established and competitive. On December 31, 2015, the Plan, with $848,600,015 in assets, was one of the top 1% of 500,000 defined contribution plans in the United States.[4] As a result, the Plan has tremendous bargaining power to demand low-cost administrative and investment management services and well-performing, low cost investment funds.

**Defendants Caused the Class to Pay Excessive Fees by Failing to Offer Available Lower Cost Mutual Fund Share Classes as Plan Investment Options**

27.    The Plan offers 21 investment options; 20 mutual funds and a stable value fund. Defendants select the Plan's investment options.

28.    A mutual fund is a company that pools money from many investors and invests the money in securities such as stocks, bonds, and short-term debt. The combined holdings of the mutual fund are known as its portfolio. Investors buy shares in mutual funds. Each share represents an investor's part ownership in the fund and the income it generates.

29.    Mutual fund companies are regulated by the Securities and Exchange Commission ("SEC") under the Investment Company Act of 1940. The Securities Act

[3]https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/publications/401kFeesEmployee.pdf
[4] http://www.plansponsor.com/2015-Recordkeeping-Survey/

of 1933 requires mutual fund companies to prepare and register with the SEC mutual fund shares offered to the public and to make a prospectus describing the mutual fund shares available to prospective investors.

30.    Mutual funds make a profit by charging investors operating expenses, which are expressed as a percentage of the total assets in the fund. Operating expenses include fund management fees, marketing and distribution fees, administrative expenses and other costs.

31.    A single mutual fund with one portfolio and one investment adviser may offer multiple "classes" of its shares to investors. Each class represents an identical interest in the mutual fund's portfolio. The principal difference between the classes is that the mutual fund will charge different operating expenses depending on the class chosen.

32.    For example, a class A share in a mutual fund may charge an annual expense ratio of 1% of the gross assets of the fund, while the institutional or I class share in that same fund with the same advisors and the same investments charges an annual expense ratio of .50%. Thus, an investor who purchases an institutional class share will realize a .50% greater annual return on his/her investment compared to an investor who purchases a class A share.

33.    Since 2011, Defendants have offered only retail class mutual fund shares as investment options for the Plan even though at all times lower cost institutional class shares of those exact same mutual funds were readily available to the Plan.

34.    The following chart illustrates the differences in the operating costs between the retail class shares chosen by Defendants and offered by the Plan and the institutional class shares of those same funds which were available to the Plan and that should have been offered instead:

| Fund | Plan Share Class | Operating Expense | Available Share Class | Operating Expense | Difference |
|---|---|---|---|---|---|
| Fidelity Advisor Freedom 2010 | A (FACFX) | 0.78% | I (FCIFX) | 0.53% | 0.22% |
| Fidelity Advisor Freedom 2015 | A (FFVAX) | 0.83% | I (FFVIX) | 0.58% | 0.25% |
| Fidelity Advisor Freedom 2020 | A (FDAFX) | 0.87% | I(/FDIFX) | 0.62% | 0.25% |
| Fidelity Advisor Freedom 2025 | A (FATWX) | 0.91% | I (FITWX) | 0.66% | 0.25% |
| Fidelity Advisor Freedom 2030 | A (FAFEX) | 0.95% | I (FEFIX) | 0.70% | 0.25% |
| Fidelity Advisor Freedom 2035 | A (FATHX) | 1.00% | I (FITHX) | 0.75% | 0.25% |
| Fidelity Advisor Freedom 2040 | A (FAFFX) | 1.00% | I (FIFFX) | 0.75% | 0.25% |
| Fidelity Advisor Freedom 2045 | A (FFFZX) | 1.00% | I (FFFIX) | 0.75% | 0.25% |

| | | | | | |
|---|---|---|---|---|---|
| Fidelity Advisor Freedom 2050 | A (FFFLX) | 1.00% | I (FFFPX) | 0.75% | 0.25% |
| Fidelity Advisor Freedom Income | A (FAFAX) | 0.72% | I (FIAFX) | 0.47% | 0.25% |
| Invesco Equity and Income Fund | A* (ACEIX) | 0.80% | Y (IEIFX) | 0.38% | 0.42% |
| Loomis Sayles Bond Fund | Admin* (LBFAX) | 1.16% | N (LSBNX) | 0.58% | 0.58% |
| MainStay Total Return Bond Fund | I* (MTMIX) | 0.60% | R6 (MTRDX) | 0.53% | 0.07% |
| American Funds - Washington Mutual Investors Fund | R3* (RWMCX) | 0.95% | R6 (RWMGX) | 0.30% | 0.20% |
| AllianzGI Technology Fund | A* (RAGTX) | 1.37% | I (DRGTX) | 1.17% | 0.20% |

| | | | | | |
|---|---|---|---|---|---|
| BlackRock Health Sciences Opportunities Fund | A* (SHSAX) | 1.19% | K (SHSKX) | 0.83% | 0.36% |
| Columbia Small Cap Value Fund II | A* (COVAX) | 1.27% | Y (CRRYX) | 0.85% | 0.42% |
| Invesco Small Cap Growth Fund | A* (GTSAX) | 1.23% | R-6 (GTSFX) | 0.74% | 0.49% |
| American Funds - EuroPacific Growth Fund | R3* (RERCX) | 1.14% | R-6 (RERGX) | 0.50% | 0.64% |
| Columbia Mid Cap Index Fund | A* (NTIAX) | 0.45% | Y (CMDYX) | 0.20% | 0.25% |
| iShares S&P 500 Index Fund | A* (BSPAX) | 0.36% | K (WFSPX) | 0.04% | 0.31% |
| Thornburg International Value Fund | A (TGVAX) | 1.28% | R6 (TGIRX) | 0.79% | 0.49% |

| BlackRock Capital Appreciation Fund | A (MDFGX) | 1.08% | I (MAFGX) | 0.77% | 0.31% |
| Mainstay Government Fund | A (MCSGX) | 0.99% | I (MGOIX) | 0.74% | 0.25% |

*Offered by the Plan as of June 17, 2017.

35.    In 2016, Defendants replaced the retail class Fidelity Advisor Freedom target date funds with JPMorgan SmartRetirement target date funds. However, Defendants again chose retail class A shares in the JPMorgan SmartRetirement target date funds instead of the lower cost institutional class R-6 shares available to qualified employer retirement plans. The chart below shows the difference in cost between the class A shares offered by the Plan and the institutional class R-6 shares:

| Fund | Plan Share Class | Operating Expense | Available Share Class | Operating Expense | Difference |
|---|---|---|---|---|---|
| JPMorgan SmartRetirement 2020 Fund | A (JTTAX) | 0.81% | R-6 (JTTYX) | 0.50% | 0.31% |
| JPMorgan SmartRetirement 2025 Fund | A (JNSAX) | 0.84% | R-6 (JNSYX) | 0.52% | 0.32% |
| JPMorgan SmartRetirement 2030 Fund | A (JSMAX) | 0.86% | R-6 (JSMYX) | 0.54% | 0.32% |

| JPMorgan SmartRetirement 2035 Fund | A (SRJAX) | 0.88% | R-6 (SRJYX) | 0.56% | 0.32% |
|---|---|---|---|---|---|
| JPMorgan SmartRetirement 2040 Fund | A (SMTAX) | 0.90% | R-6 (SMTYX) | 0.58% | 0.32% |
| JPMorgan SmartRetirement 2045 Fund | A (JSAAX) | 0.90% | R-5 (JSAIX) | 0.68% | 0.22% |
| JPMorgan SmartRetirement 2050 Fund | A (JTSAX) | 0.90% | R-5 (JTSIX) | 0.68% | 0.22% |
| JPMorgan SmartRetirement 2055 Fund | A (JFFAX) | 0.90% | R-5 (JFFIX) | 0.68% | 0.22% |
| JPMorgan SmartRetirement Income Fund | A (JSRAX) | 0.72% | R-5 (JSIIX) | 0.61% | 0.11% |

36.    Defendants continue to offer retail class shares rather than institutional class shares to the Class. By choosing retail class shares instead of available institutional class shares for every fund offered by the Plan, Defendants caused and continue to cause the Class to pay additional investment costs ranging from 0.05% to 0.64% on every mutual fund offered through the Plan.

37.    The extra fees cost the Class millions of dollars per year. For example, the Plan participants lost $319,329 in 2015 alone because they paid an additional 0.42% in operating expenses to invest in class A shares of Invesco Equity and Income Fund instead of the less expensive class Y shares available to the Plan.

38.    Defendants were aware that higher operating costs would reduce the amount Plan participants realized on their investments because Defendants included the following statement regarding fees in the Plan's 29 CFR 2550.404a-5 annual disclosures to the participants: "The cumulative effect of fees and expenses can substantially reduce the growth of your retirement savings. Visit the Department of Labor's Web site for an example showing the long-term effect of fees and expenses at http://www.dol.gov/ebsa/publications/401k_employee.html."

39.    Defendants failed to use the Plan's bargaining power to leverage lower cost mutual fund options for the Class.

40.    Defendants had no adequate annual review or other process in place to fulfill their continuing obligation to monitor Plan investments, or, in the alternative, failed to follow the processes, as evidenced by:

    a.  The Plan offered and continues to offer only retail share classes as Plan investment options;

    b.  The Plan does not offer a single institutional share class investment option; and

    c.  The Plan replaced retail class Fidelity Target date funds with retail class JP Morgan Chase target date funds in 2016.

41.    The total amount of excess mutual fund expenses paid by the Class over the past six years, which correspondingly reduced the return on the Class' investments, exceeds $10 million.

**Defendants Paid Plan Recordkeeper John Hancock Unreasonable Fees**

42.    Recordkeeping is a necessary service for every defined contribution plan. Recordkeeping services for a qualified retirement plan, like the Plan, are essentially fixed and largely automated. The cost of recordkeeping and administrative services depends on the number of participants, not the amount of assets in the participant's account.

43.    Recordkeeping for 401(k) plans like the Plan and its participants is fundamentally the same as keeping records for a brokerage account with a few additional points of data. It is a system where costs are driven purely by the number of inputs and the number of transactions. In essence, it is a computer-based bookkeeping system.

44.    The greatest cost incurred in incorporating a new retirement plan into a recordkeeper's system is for upfront setup costs. After the Plan account is set up, individual accounts are opened by entering the participant's name, age, SSN, date of hire and marital status. The system also records the amount a participant wishes to contribute each pay period through automated payroll deductions. Participants can go on-line and change their contribution rate at any time.

45.    There are numerous recordkeepers in the marketplace who are capable of providing a high level of service to the Plan, and who will readily respond to a request for proposal. These recordkeepers primarily differentiate themselves based on service and price, and vigorously compete for business by offering the best service for the best price.

46.    Because the cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account.

47.    Recordkeepers for defined benefit plans are generally compensated in two ways: First, through direct payments from the plan or its participants; and second, through a practice known as revenue sharing.

48.    In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the 401(k) plan's recordkeeper putatively for providing marketing, recordkeeping and administrative services for the mutual fund. These fees include: Rule 12b-1 fees, which are paid by the Funds to the recordkeeper as compensation for its

services and expenses in connection with the sale and distribution of Fund shares; shareholder service fees; and sub-transfer agency fees. The payments are **not** tied to actual expenses incurred by the recordkeeper.

49.    Because revenue sharing arrangements pay recordkeepers asset-based fees, prudent fiduciaries monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper is not receiving unreasonable compensation. A prudent fiduciary ensures that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable per participant recordkeeping fee that can be obtained from the recordkeeping market through competitive bids.

50.    Because revenue sharing payments are asset based, they bear no relation to the actual cost to provide services or the number of plan participants and can result in payment of unreasonable recordkeeping fees.

51.    Based on the number of Plan participants and the assets in the Plan, a reasonable recordkeeping fee for the Plan is, at most, approximately $40 per participant.

52.    Defendants originally chose New York Life Investment Management to serve as the Plan's recordkeeper and investment platform.  In 2014, John Hancock acquired New York Life's Retirement Plan Services business and continued as the Plan recordkeeper.

53.    In 2016, John Hancock was the nation's 3rd largest recordkeeper by number of defined contribution plans[5] with 56,133 plans and 2,585,797 participants. The Plan was one of John Hancock's 14 largest plans.[6]

54.    As the recordkeeper, John Hancock received both direct payments from the Plan and revenue sharing payments ranging from 0.25% to 0.70% from every mutual fund offered as an investment option by the Plan.

---

[5] http://www.plansponsor.com/2017-Recordkeeping-Survey/?type=top
[6] http://www.plansponsor.com/2017-Recordkeeping-Survey/?pid=24&pname=John-Hancock-Retirement-Plan-Services

55.    Based on the direct and indirect compensation levels shown on the Plan's Form 5500s filed with the Department of Labor between 2011 and 2016, the Plan paid much more than a reasonable fee for John Hancock's services, resulting in the Plan paying millions of dollars in excessive recordkeeping fees each year.

56.    The following chart sets forth the total compensation received by John Hancock from the Plan and its participants, the revenue sources, and the cost per participant:

| Year | Direct | Revenue Share | Total Compensation | Participants | Cost/ Participant |
|------|--------|---------------|--------------------|--------------|--------------------|
| 2011 | $327,699 | $2,584,440 | $2,912,139 | 20,303 | $143 |
| 2012 | $325,268 | $2,956,501 | $3,281,769 | 21,381 | $153 |
| 2013 | $350,902 | $3,383,711 | $3,734,613 | 21,380 | $175 |
| 2014 | $354,539 | $3,698,616 | $4,053,155 | 23,098 | $175 |
| 2015 | $446,207 | $4,242,139 | $4,688,346 | 27,984 | $167 |
| 2016 | $431,499 | $3,967,500 | $4,398,999 | 27,178 | $161 |

57.    The amount of the excess fees paid to John Hancock by the Plan from 2011 to the present, based on a reasonable recordkeeping fee of $40 per participant, is set forth in the chart below.

| Year | Total Compensation | Compensation at $40/Participant | Difference |
|------|--------------------|---------------------------------|------------|
| 2011 | $2,912,139 | $812,120 | $2,100,019 |
| 2012 | $3,281,769 | $855,240 | $2,426,529 |
| 2013 | $3,734,613 | $855,200 | $2,879,413 |
| 2014 | $4,053,155 | $923,920 | $3,129,235 |

| 2015 | $4,688,346 | $1,119,360 | $3,568,986 |
| 2016 | $4,398,999 | $1,087,120 | $3,311,879 |
| **Total** | **$23,069,021** | **$5,652,960** | **$17,416,061** |

58.    Information is not publicly available for 2017 because the Plan has not filed its Form 5500 with the Department of Labor for that year. However, based on past disclosures and the investment lineup currently offered by the Plan, Plaintiffs believe the Plan continued to pay excessive compensation to John Hancock in 2017.

59.    The unreasonable fees paid to John Hancock through its revenue sharing arrangements directly resulted from Defendants' choice of improper mutual fund share classes.

60.    The mutual funds paid John Hancock annual revenue sharing fees based on a percentage of the total Plan assets invested in the fund, which were ultimately paid by Class Members who invested in those funds. The Class Members realized lower returns on their investments because they paid higher fund operating expenses.

61.    For example, the Columbia Small Cap Value Fund II charged operating expenses of 1.27% annually to Plan participants who invested in the fund. The fund then paid John Hancock 0.50% in Rule 12b-1 and shareholder service fees. Had the Defendants offered Y class shares of the Columbia fund, which pays no Rule 12b-1 fees, Plan participants would have paid 0.42% less in operating expenses, John Hancock would have received 0.42% less from the mutual fund, and the participants' return on investment would have increased by 0.42%. Instead, that money was paid to John Hancock, resulting in a detriment to the Plan and its participants.

62.    Defendants failed to use the Plan's bargaining power to leverage John Hancock to charge lower recordkeeping fees for the Plan participants.

63.    Defendants failed to take any or adequate action to monitor, evaluate or reduce John Hancock's fees, such as:

a. Choosing institutional class mutual fund shares with lower revenue sharing for the Plan;

b. Seeking competing bids from other providers for recordkeeping services; or

c. Negotiating with John Hancock to cap the amount of revenue sharing or ensure that any excessive amounts were returned to the Plan.

## ERISA'S Fiduciary Standards

64. ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants as fiduciaries. 29 U.S.C. §1104(a)(1)(A) requires a plan fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" for the "exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

65. A fiduciary's duties include a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

66. 29 U.S.C. §1104(a)(1)(B) requires a plan fiduciary to discharge his obligations "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims."

67. 29 U.S.C. §1106(a)(1)(C) and 29 U.S.C. §1108(b)(2) allows a fiduciary of an employee benefit plan to enter into an agreement with a party in interest for the provision of administrative services such as recordkeeping to the Plan "if no more than reasonable compensation is paid therefor." John Hancock, as the recordkeeper for the Plan, is a "party in interest" under 29 U.S.C. §1106(a)(1)(C).

68. 29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109.

69.    Section 1109(a) provides "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach."

## CLASS ACTION ALLEGATIONS

70.    29 U.S.C. §1132(a)(2) authorizes any Plan participant or beneficiary to bring an action to enforce a breaching fiduciary's liability, including liability under 29 U.S.C. § 1109(a). Plaintiffs have standing to bring these ERISA claims because there is a causal connection between Defendants' actions and actual harm to an ERISA Plan in which Plaintiffs participate or participated. "A plaintiff may seek relief under § 1132(a)(2) that sweeps beyond his own injury." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 592-593 (8th Cir. 2009); *see also DeWolff, Boberg & Associates, Inc.*, 552 U.S. 248, 256 (2008) (§ 1132(a)(2) does not provide a remedy for individual injuries distinct from plan injuries).

71.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representative of, the following class:

> All participants and beneficiaries of the Supplemental Income 401(k) Plan from December 1, 2011 through the date of judgment, excluding the Defendants.

72.    This action meets the requirements of Federal Rule of Civil Procedure 23 and is certifiable as a class action for the following reasons:

> a. The Class includes more than 27,000 members and is so large that joinder of all members is impracticable.

b.  There are questions of law and fact common to the Class because Defendants owed fiduciary duties to the Plan and to all participants and beneficiaries and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Class; what are the losses to the Class resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breach of duty.

c.  Plaintiffs' claims are typical of the claims of the Class because Plaintiffs were Plan participants during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d.  Plaintiffs will adequately represent the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.  Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants with respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the

adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

73.     A class action is a superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

74.     Plaintiffs' counsel, Franklin D. Azar & Associates, P.C. and Frank Sims & Stolper LLP, will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g).

## FIRST CLAIM FOR RELIEF

### Breach of Duties of Loyalty and Prudence—Unreasonable Investment Operating Expenses Against All Defendants

75.     Plaintiffs incorporate all the prior allegations of the Complaint.

76.     The scope of Defendants' fiduciary duties and responsibilities includes managing the assets of the Plan for the sole and exclusive benefit of the Class, defraying reasonable expenses of administering the Plan, and acting with the care, skill, diligence, and prudence required by ERISA.

77.     Defendants are responsible for selecting prudent investment options for the Class. Defendants' duty of prudence requires them to evaluate and monitor the Plan's investments on an ongoing basis and remove imprudent ones based on performance and operating expenses.

78.     A prudent fiduciary familiar with such matters acting with the care, skill, prudence, and diligence under the circumstances then prevailing would have investigated the availability of lower expense institutional mutual fund share classes and offered institutional classes as investment options to the Class.

79.     The existence of lower priced alternative classes of mutual funds is readily ascertainable from the fund prospectuses or through publicly available investment websites such as Morningstar.com by typing in the mutual fund share symbol.

80.     Defendants breached their duty of prudence, owed at a minimum under 29 U.S.C. §1104(a)(1), by selecting and retaining as Plan investment options mutual fund retail share classes with high fees and revenue sharing when lower-cost institutional share classes for the identical funds with identical investment managers and investments and no revenue sharing were available to the Plan at all relevant times. Defendants' breaches caused damage to the Class.

81.     The failure of the Plan to offer any institutional class mutual fund shares and the replacement of the Fidelity target date funds with retail class JP Morgan target date funds in 2016 show Defendants failed to implement or follow any rational process for reviewing and evaluating the investment options offered to Plan participants, including reviewing whether appropriate mutual fund share classes were being offered or whether less expensive alternatives with lower revenue sharing were available.

82.     Each Individual Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate. Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been made

available to Plan participants to date.

83.    Each Defendant also knowingly participated in each of the other Defendants' breaches, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of his co-fiduciaries under 29 U.S.C. §1105(a).

## SECOND CLAIM FOR RELIEF

### Breach of Duties of Loyalty and Prudence—Unreasonable Administrative Fees

### Against All Defendants

84.    Plaintiffs incorporate the prior allegations of the Complaint.

85.    The fiduciary duties of Defendants include defraying reasonable expenses of administering the Plan for the benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence required by ERISA.

86.    29 U.S.C. §1106(a)(1)(C) and 29 U.S.C. §1108(b)(2) require compensation for recordkeeping and other administrative services paid to a party in interest be "reasonable."

87.    If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. See *George v. Kraft Foods Global, Inc*., 641 F.3d 786, 798–99 (7th Cir. 2011). Similarly, "us[ing] revenue sharing to benefit [the plan sponsor and recordkeeper] at the Plan's expense" while "failing to monitor and control recordkeeping fees" and "paying excessive revenue sharing" is a breach of fiduciary duties. *Tussey v. ABB, Inc.,* 746 F.3d 327, 336 (8th Cir. 2014).

88.    Defendants breached their fiduciary duties, and caused damage to the Class, by (1) failing to monitor and control the amount the Plan paid John Hancock for recordkeeping through revenue sharing; (2) failing to determine whether John Hancock's asset-based pricing was competitive; (3) failing to solicit competitive bids

from vendors; and (4) failing to adequately leverage the Plan's size to negotiate reduced fees and rebates with John Hancock.

89.    Allowing John Hancock to receive fees exceeding $150 per Plan participant from 2011 to the present shows Defendants failed to implement or follow any rational process for reviewing, analyzing and monitoring the expenses of administering the Plan, including soliciting competing bids and determining whether the fees were reasonable.

90.    Each Individual Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate. Total Plan losses will be determined at trial after complete discovery in this case and are illustrated herein based upon the limited information that has been made available to Plan participants to date.

91.    Each Defendant also knowingly participated in each of the other Defendants' breaches, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of his co-fiduciaries under 29 U.S.C. §1105(a).

## PRAYER FOR RELIEF

Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request the Court:

- Certify the Class, appoint Plaintiffs as class representatives, and appoint Franklin D. Azar & Associates, P.C. and Frank Sims & Stolper LLP as Class Counsel;
- Find and declare that Defendants have breached their fiduciary duties as described above;
- Find and adjudge that Defendants are liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore

the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- Order Defendants to provide an accounting necessary to determine the amounts Defendants must make good to the Plan under §1109(a);

- Award to Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant other equitable or remedial relief as the Court deems appropriate.

**PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL ISSUES SO TRIABLE.**

Dated: November 28, 2017

_/s/ Andrew D. Stolper_
Andrew D. Stolper (205462)
Jason M. Frank (190957)
Scott H. Sims (234148)
Frank Sims & Stolper LLP

Jonathan Parrott (248652)
Franklin D. Azar & Associates, P.C.
_Attorneys for Plaintiffs_